## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| APRIL SHAUNTA MORRIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:24-cv-02409-SHL-cgc |
| AUTOZONERS, LLC, and AUTOZONE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants AutoZoners, LLC and Autozone, Inc.'s[1] ("Defendants")

Motion for Summary Judgment (ECF No. 48), filed May 22, 2025.  Plaintiff April Shaunta

Morris responded on June 19 (ECF No. 51) and Defendants replied on July 3 (ECF No. 54).  In

their Motion, Defendants—Plaintiff's former employer—seek summary judgment on Plaintiff's

claims for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1965

("Title VII") and the Tennessee Human Rights Act ("THRA"), as well as Plaintiff's state law

claims for outrageous conduct and intentional infliction of emotional distress ("IIED").  (See

ECF No. 48 at PageID 555–56.)

For the reasons discussed below, Defendants' motion is **GRANTED**.

---

[1] Defendants contend that "AutoZoners, LLC is the only proper Defendant as it was Plaintiff's employer and the employer of all relevant employees," but both AutoZoners, LLC and AutoZone, Inc. filed this Motion.  (ECF No. 48 at PageID 555.)

## BACKGROUND[2]

In June 2023,[3] Plaintiff began working for Defendants as the Commercial Specialist at Store 324. (ECF Nos. 51-1 at PageID 887 ¶ 9; 54-1 at ¶¶ 3.). She reported directly to Store Manager Demetrous Gilbert, who was responsible for running the store and managing all of its personnel. (ECF Nos. 51-1 at PageID 888 ¶ 14; 54-1 at ¶ 1.) Gilbert's direct supervisor was District Manager James Johnson, and Johnson's supervisor was Regional Manager Steve Sinor. (ECF Nos. 51-1 at PageID 888–89 ¶ 15; 54-1 at ¶ 1.) Marvin Smith was the Regional Human Resources Manager. (ECF No. 51-1 at PageID 889 ¶ 18.)

Juan Ramirez worked with Plaintiff at Store 324 as the Commercial Sales Manager. (Id. at PageID 887 ¶ 10.) The parties agree that Ramirez ran the commercial side of the store, and, in that role, could ask Plaintiff to answer the commercial phone and seek her assistance in filling orders. (Id. at PageID 888 ¶ 11; ECF No. 54-1 at ¶ 2.) Defendants deny that Ramirez was Plaintiff's supervisor, while Plaintiff asserts that he was. (See ECF Nos. 48-2 at PageID 576–78; 51 at PageID 868–69.)

### I.    Plaintiff and Ramirez's Working Relationship Between June and July 2023

Both Plaintiff and Ramirez reported late to work on Saturday, the day after Plaintiff started. (ECF No. 54-1 at ¶ 11.) Ramirez told Gilbert[4] and others that he had been out all night

---

[2] These facts are undisputed, unless otherwise noted.

[3] According to an exhibit HR Manager Marvin Smith identified during his deposition, Plaintiff's date of hire was June 6. (ECF No. 48-4 at PageID 671, 686.) Oddly, however, the parties do not include this date in their arguments, or agree to a specific date in June as her start date.

[4] Plaintiff reported that Ramirez said this "around the [fifth] of June." (ECF No. 48-3 at PageID 651). However, if Plaintiff was hired on June 6, 2023, the closest Saturday to her hiring date would have been June 10.

with her and they had sex.  (Id. at ¶ 13.)  Plaintiff denies ever engaging in sexual activity with

Ramirez.  (Id. at ¶ 20.)

Following Ramirez's report to Gilbert, Gilbert called his supervisor, Johnson, who came

to Store 324 and spoke to Ramirez and Plaintiff.[5]  (Id. at ¶¶ 16, 21.)  The parties dispute if

Gilbert mentioned "sex harassment" to Johnson—Plaintiff argues that he did, but Defendants

assert that he did not.  (Id. at ¶¶ 15–16.)

The following Monday, Gilbert observed that Ramirez and Plaintiff's working

relationship became worse (id. at ¶¶ 17, 21), and that Plaintiff was upset about working with

Ramirez (ECF No. 51-1 at PageID 899 ¶ 48).[6]  According to Gilbert, that day, Plaintiff

discovered that Ramirez had a wife.  (ECF No. 54-1 at ¶ 17.)  In response to a request from

Gilbert, Johnson came to Store 324 to address Plaintiff's hostility toward Ramirez.  (Id. at ¶ 22.)

Gilbert, Johnson, and Ramirez met and discussed Plaintiff not wanting to work with Ramirez.

(Id. at ¶ 23.)  Gilbert told Johnson "those two cannot work together" and "I told you from the

beginning I believe we had a situation, and now we have a situation."  (Id.)

Plaintiff asserts, and Defendants dispute, that she met with Johnson during that visit.  (Id.

at ¶ 24.)  According to Plaintiff, after she asked to move away from Ramirez, Johnson told her

that Ramirez was not used to working with a "pretty girl" and she would not be moved away

from him.  (Id.)  Defendants assert that this conversation never happened.  (Id.)

---

[5] Although the exact date is unclear, Gilbert stated that he reported the incident to
Johnson "probably a couple days after" Plaintiff and Ramirez were late to work.  (ECF No. 48-4
at PageID 695.)

[6] Again, the exact date is not specified.  The closest Monday to a June 6 hiring date
would have been June 12, and the following Monday would have been June 19.

On another day after Johnson's visit, Ramirez pinched Plaintiff while at work.  (Id. at ¶¶ 26, 32; ECF No. 51-1 at PageID 897 ¶ 42.)  Plaintiff alleges that the pinch occurred at some point between June 5 and June 16 and that she reported the incident to Gilbert, both of which Defendants dispute.[7]  (ECF No. 54-1 at ¶¶ 26, 29–30.)[8]  Plaintiff alleges that Ramirez came up from behind while she was standing on a ladder and pinched her buttocks so hard that it left a bruise.  (Id. at ¶ 26; ECF No. 51-1 at PageID 897 ¶ 42.)  According to Plaintiff, she made it clear that Ramirez's conduct was "unwelcomed" and "he was not to touch her again."  (ECF No. 54-1 at ¶ 27.)

On July 17, Plaintiff sent a text message before work, stating that she would be late.  (ECF No. 51-1 at PageID 894 ¶ 30.)  Ramirez responded "we['re] slow just don't even come in," and Plaintiff did not go to work that day.  (Id. at PageID 894 ¶ 31; ECF No. 54-1 at ¶ 35.)

The next day, July 18th, Plaintiff arrived at Store 324 and told Ramirez that she wanted to transfer to a different store.  (ECF No. 54-1 at ¶ 36.)  The parties dispute what happened next.  According to Plaintiff, she told Ramirez that things had to change, and she did not feel comfortable working with him.  (Id. at ¶ 36.)  Plaintiff testified that, in response, Ramirez told her to "go home" and "get the fuck off my clock" as he screamed at her.  (Id. at ¶ 37; ECF No. 51-1 at PageID 894–95 ¶ 32.)  She argues that Ramirez's conduct was "explosive, violent, [and] sexual."  (ECF No. 51-1 at PageID 895 ¶ 33.)  Plaintiff alleges that she asked Gilbert if she had to leave, and he did not respond.  (Id. at PageID 895 ¶ 34.)  Although they agree that Plaintiff left

---

[7] Based on Plaintiff's June 6 date of hire, the pinch likely could not have occurred until later that month or even in July.  Plaintiff testified that she could not recall the exact date of the pinch.  (See ECF Nos. 51-2 at PageID 930; 54-1 at ¶ 26.)

[8] Gilbert testified that he was on vacation when the pinch occurred and learned about it when he returned.  (ECF No. 51-5 at PageID 1093.)

work early on July 18, Defendants dispute Plaintiff's characterization of the incident.  (Id. at

PageID 895–96 ¶ 35; ECF No. 54-1 at ¶¶ 37–38.)

## II.    Defendants' Reporting Policies and Plaintiff's July 18 Hotline Complaint

Defendants' "Respect in the Workplace" policy provides that "AutoZone prohibits

coworkers and third parties, as well as supervisors and managers, with whom AutoZoners come

into contact, from engaging in unlawful discriminatory or harassing conduct."  (ECF No. 54-1 at

¶ 49.)  Defendants' policy also provides that managers who know of sex harassment must report

it to human resources.  (Id. at ¶ 9; see also id. at ¶ 4.)

Plaintiff admits that she had a general knowledge of Defendants' written policy

prohibiting sexual harassment and acknowledged reading the company handbook.  (ECF No. 51-

1 at PageID 889–90 ¶¶ 20–21, 23.)  Although Plaintiff stated that she was unsure of the reporting

procedures for allegations of sexual harassment or retaliation, the parties agree that she knew

complying with Defendants' policies was important.  (Id. at PageID 889–91 ¶¶ 19, 24.)

After Plaintiff left her shift on July 18, she made a complaint via Defendants' 1-800

hotline.  (Id. at PageID 896 ¶ 36; ECF No. 54-1 at ¶¶ 6, 40.)  Prior to this report, no one in

management reported the alleged misconduct to Human Resources, although Defendants contend

that Plaintiff did not allege sexual harassment and/or retaliation prior to the hotline report.[9]

(ECF No. 54-1 at ¶ 7.)

_____

[9] Plaintiff asserts, and Defendants dispute, that it would have been inappropriate for her
to make a hotline complaint before this point.  Plaintiff contends that, under Defendants' policy,
an employee was expected to report any sexual harassment or retaliation to her store manager,
and the hotline would come into use when an employee felt uncomfortable reporting to her
supervisor.  (ECF No. 54-1 at ¶ 5.)  According to Plaintiff, she reported complaints to Gilbert and
Johnson multiple times before making the hotline complaint.  (Id. at ¶ 6.)  However, Defendants
argue that there is no evidence Plaintiff made these reports, and, under the applicable policy, she
was required to report alleged harassment to her HR Manager (Smith) or to the hotline.  (Id.)

III.    **Aftermath of July 18 Hotline Complaint**

Immediately following the hotline complaint, Plaintiff was temporarily sent to Store

9801.[10]  (ECF Nos. 54-1 at ¶ 41; 51-1 at PageID 896 ¶ 38.)  HR Manager Smith met with

Plaintiff on July 19 at Store 9801, and Plaintiff reported the alleged sexual harassment.  (ECF

Nos. 51-1 at PageID 896–97 ¶ 39; 54-1 at ¶ 42.)  She described Ramirez's buttocks pinch while

she was standing on a ladder, stated that it occurred at some point between June 5 and June 16,

and asserted that Ramirez reduced her hours and ran her out of the store.  (ECF Nos. 51-1 at

PageID 897 ¶ 42; 54-1 at ¶ 42.)  Plaintiff also reported that Ramirez supposedly represented to

Gilbert and male managers that she and Ramirez had sex; however, she never heard Ramirez

make those statements.  (ECF No. 51-1 at PageID 898 ¶¶ 44–45.)  When asked, Plaintiff stated

that she was comfortable continuing to work at Store 9801.  (Id. at PageID 901 ¶ 54.)

After speaking with Plaintiff on July 19, Smith and Human Resource Generalist Aundre

Clinton interviewed Gilbert.  (Id. at PageID 901–02 ¶ 55–56; ECF No. 54-1 at ¶ 43.)  In his

statement, Gilbert confirmed that, between June and July 2023, (1) Ramirez stated that he had

sex with Plaintiff, (2) Gilbert reported this to Johnson a few days later, (3) when Gilbert returned

from vacation, Plaintiff told him that she did not feel comfortable working around Ramirez, and

(4) Ramirez sent Plaintiff home without Gilbert's approval.  (ECF No. 54-1 at ¶ 43.)

Ramirez submitted a statement to Defendants in which he denied touching Plaintiff's

buttocks but admitted telling Gilbert that he and Plaintiff had sex.  (ECF No. 51-1 at PageID 902

---

[10] According to Plaintiff, after her July 18 shift, she called Johnson, who told her that she
had to go back and work with Ramirez the next day.  (ECF No. 54-1 at ¶ 39.)  Defendants
challenge this statement as inadmissible hearsay contradicted by Plaintiff's other testimony.  (Id.)
Regardless, Plaintiff did not go back to work with Ramirez after Defendants' prompt response to
the hotline complaint.

¶¶ 57–58.)  He also admitted telling Plaintiff to clock out and leave the store.[11]  (ECF No. 54-1 at ¶ 44.)

Smith recommended Ramirez's discharge, which Sinor approved.  (Id. at ¶ 45.)  Ramirez was terminated on July 31.  (Id. at ¶ 46.)  The parties agree that Ramirez was discharged in part because of harassment and in part because of a policy violation, based on his statement that he had sex with a subordinate.[12]  (ECF No. 51-1 at PageID 903 ¶ 62.)  According to Defendants, if true, this conduct violated policies which prohibit relationships between employees.  (Id.)

On August 1, the day after Ramirez's discharge, Plaintiff's car was shot while in the parking lot of Store 9801.  (ECF No. 54-1 at ¶ 52.)  The police showed Plaintiff the video of the shooting, and she believes that Ramirez's car is in the footage.  (Id. at ¶ 57.)  Although Plaintiff believes that Ramirez was responsible for the shooting, Defendants contend that no evidence demonstrates his involvement.  (Id. at ¶ 53.)

After the shooting, Plaintiff moved to avoid Ramirez knowing where she lived.  (Id. at ¶ 61.)  Plaintiff asked if she could take time off to facilitate that move, and Defendants told her to take as much time as she needed.  (ECF No. 51-1 at PageID 904 ¶ 65.)

When Plaintiff told Defendants that she was ready to return to work, they gave her four options that allowed her to work as a Commercial Specialist (the position she held upon hire in

---

[11] In his statement, Ramirez denied cursing at Plaintiff.  (ECF No. 48-4 at PageID 709.)  According to Ramirez, Plaintiff "was upset and yelling and being argumentative so [he] told her to clock out and go home."  (Id.)

[12] Defendants argue that Ramirez was "not terminated on account of anything finding that he had, in fact, sexually harassed Plaintiff."  (ECF No. 54-1 at ¶ 46 (emphasis in original).)  However, according to an exhibit identified during Johnson's deposition, Defendants curiously include in their termination report that Ramirez was terminated for "[h]arassment, including sexual harassment or unwanted physical contact," "[f]ailure to comply with [Defendants'] Policy," and "[l]oss of confidence."  (ECF No. 51-6 at PageID 1104–05, 1107).  However, this report does not specify who the harassment was targeting.  (Id. at PageID 1107.)

June 2023) or as another type of manager—she could work at Store 324, Store 9801, or two other stores.  (ECF No. 51-1 at PageID 904–05 ¶ 68.)  Plaintiff filled in at Store 8 for around a week when that store's Commercial Specialist was out.  (Id. at PageID 905 ¶ 69; ECF No. 54-1 at ¶ 62.)  When Plaintiff told Sinor that she wanted to remain at Store 8, he told her that there was no Commercial Specialist position there, but that she could remain there in an open manager position, which required working some nights.  (ECF No. 51-1 at PageID 905–06 ¶¶ 70–71, 74.)  Plaintiff was unwilling to do that.  (Id.; see also ECF No. 54-1 at ¶ 71.)  Plaintiff stated that she felt in danger working at stores where she believed Ramirez had contacts and might look for her.  (ECF No. 54-1 at ¶ 63.)

On or about September 18, Plaintiff resigned from her position with Defendants and joined Advance Auto Parts, a competitor.  (ECF Nos. 51-1 at PageID 907 ¶ 79; 54-1 at ¶ 72.)  The parties agree that Plaintiff never saw Ramirez after July 18.  (ECF No. 51-1 at PageID 901 ¶ 53.)

On June 14, 2024, Plaintiff filed her complaint containing the following claims: sexual harassment and discrimination in the form of a hostile work environment under Title VII of the Civil Rights Act of 1965 ("Title VII") (Claim 1) and the Tennessee Human Rights Act ("THRA") (Claim 2), retaliation under Title VII (Claim 3) and the THRA (Claim 4), and outrageous conduct and IIED under state law (Claim 5).  (ECF No. 1.)  Defendants seek summary judgment, arguing that there are no disputes of material fact and that they are entitled to judgment as a matter of law.  (ECF No. 48 at PageID 555.)  However, Plaintiff contends that factual disputes defeat summary judgment.  (ECF No. 51 at PageID 863.)  Although there are factual disputes in this matter, many of those disputes are not material.  In addition, as explained below, even taking Plaintiff's allegations as true, these causes of action fail as a matter of law.

## ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if "proof of that fact would establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012) (citing Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984)). The Court views facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation modified).

Once a properly supported motion for summary judgment has been made, the party opposing summary judgment must show that there is a genuine dispute of material fact by pointing to evidence in the record, or argue that the moving party is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Although the court views all evidence and factual inferences in the light most favorable to the non-moving party, "the mere existence of some alleged factual dispute[s] between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247–48 (emphasis in original). The court's role is not to weigh evidence or assess the credibility of witnesses, but simply to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

Kroll v. White Lake Ambulance Auth., 763 F.3d 619, 623 (6th Cir. 2014) (internal quotation

marks omitted) (quoting Anderson, 477 U.S. at 251–52).

Defendants argue that (1) the time frame and conduct at issue do not establish a hostile

work environment under the law, (2) Plaintiff suffered no adverse employment action, a

requirement for a retaliation claim, and (3) as a matter of law, Defendants engaged in no conduct

rising to the level of being "outrageous."  Each argument is addressed below.

I.      **Hostile Work Environment**

First, Defendants argue that Plaintiff cannot demonstrate that she experienced sexual

harassment based on a hostile work environment under Title VII and the THRA.  Title VII and

THRA hostile work environment claims are evaluated using the same standard.  See Austin v.

Alexander, 439 F. Supp. 3d 1019, 1024 n.2. (M.D. Tenn. 2020) (quoting Bailey v. USF Holland,

Inc., 526 F.3d 880, 885 n.1 (6th Cir. 2008)).  To make out this claim, a plaintiff must

demonstrate that "'(1) she was a member of a protected class; (2) she was subjected to

unwelcome . . .  harassment; (3) the harassment complained of was based on sex; (4) the charged

sexual harassment created a hostile work environment; and (5) the employer is liable.'"

Schlosser v. VRHabilis, LLC, 113 F.4th 674, 683 (6th Cir. 2024) (omission in original) (quoting

Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 733 (6th Cir. 2006)).  Defendants argue

that, even assuming Plaintiff's allegations to be true, she did not suffer the severe or pervasive

type conduct necessary to meet the fourth element.  As explained below, the Court agrees.

Under Title VII, a hostile work environment is one where "'the workplace is permeated

with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment,'"

objectively and subjectively.  Randolph, 453 F.3d at 733 (quoting Harris v. Forklift Sys., Inc.,

510 U.S. 17, 21 (1993)).  "[I]n other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim" based on the totality of the circumstances.  Id. (internal citations omitted).  "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' do not create a hostile work environment."  Nicholson v. City of Clarksville, 530 F. App'x 434, 442 (6th Cir. 2013) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  Courts generally consider factors such as "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Schelle v. City of Piqua, No. 24-3980, 2025 WL 1592135, at *4 (6th Cir. June 5, 2025) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001); Burnett v. Tyco Corp., 203 F.3d 980, 982 (6th Cir. 2000)).

Defendants argue that Plaintiff has not demonstrated that she experienced severe or pervasive conduct based on her contentions that Ramirez pinched her buttocks, told others that he and Plaintiff had sex, and yelled at her and sent her home from work, particularly given that the actions at issue are alleged to have occurred over a relatively short time period.  (ECF Nos. 48-2 at PageID 574–76; 54 at PageID 1121–22.)  Plaintiff responds that Ramirez's actions, along with management assuming she was hostile to Ramirez because he was married, the meetings and reports regarding Ramirez's conduct and Defendants' actions relating to the shooting of her car, and her leaving her job all combined to create a hostile work environment.  (ECF No. 51 at PageID 866–68.)

However, Plaintiff's contentions that are connected to her sex can be the only ones that support her hostile work environment based on sex claim.  All of those contentions occurred over an approximate six-week time period between June and mid-July 2023, specifically Ramirez

pinching her buttocks, spreading rumors and impacting her work hours for two days, and management allegedly not addressing sexual misconduct concerns.  (See id.)  After her hotline complaint on July 18, she was immediately moved away from Ramirez and never saw him again, and Ramirez was terminated July 31.  (ECF No. 51-1 at PageID 896 ¶ 38, PageID 901 ¶ 53, PageID 902–03 ¶ 59.)  Given the relatively short time frame at issue and management's actions in moving her away from Ramirez and terminating him, these incidents, viewing them in totality, are not "severe" or "pervasive" enough to constitute a hostile work environment claim from a reasonable person's perspective.

The law supports this conclusion.  For instance, in Stacy v. Shoney's Inc., 142 F.3d 436 (table), 1998 U.S. App. LEXIS 6659, at *3 (6th Cir. Mar. 31, 1998), the plaintiff asserted that her manager harassed her with "sexually suggestive comments and leering looks," and "inappropriately touched her breast when he removed and replaced an ink pen from her front shirt pocket and said, '[t]hat's a nice pen,'" all during a two-month period.  Although his actions were offensive, the court concluded that they were "not sufficiently frequent, severe, physically threatening, or humiliating to unreasonably interfere with [the p]laintiff's work performance to constitute actionable work place harassment."  Id. at *3, *10.  In Hudson v. M.S. Carriers, Inc., 335 F. Supp. 2d 853, 857, 862 (W.D. Tenn. 2003), aff'd, 126 F. App'x 297 (6th Cir. 2005), a manager's conduct over an approximately four-month period was not "severe or pervasive" enough to constitute a hostile work environment claim when he allegedly asked an employee what kind of "panties" she had on, told her a story about going to a strip club, showed her a pencil that he called his "fake penis," took off his shoe and touched her with his feet, wet his finger and placed it in her ear, and stated that he wanted to make "Oreo cookies" with her, which she took to imply that he wanted to have sex.  In Burnett, 203 F.3d at 981, a manager allegedly

12

placed a pack of cigarettes inside an employee's bra strap, offered the coughing employee a cough drop while stating "since you have lost your cherry, here's one to replace the one you lost," and commented "dick the malls, dick the malls, I almost got aroused" when walking by the employee in a "deck the malls" holiday sweater. Despite the severity of the cigarette pack incident, the Sixth Circuit found that "a single battery coupled with two merely offensive remarks over a six–month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment." Id. at 985.

Plaintiff's allegations of incidents over a less than two-month time frame, while offensive and inappropriate, do not meet the Sixth Circuit's standard to demonstrate a hostile work environment claim based on her sex. Under the totality of circumstances, even if all of her allegations are true, Plaintiff cannot demonstrate as a matter of law that she experienced a hostile work environment.[13]

## II. Retaliation

Defendants next argue that they are entitled to summary judgment as to Plaintiff's retaliation claims. Like the hostile work environment claims, retaliation claims under Title VII and the THRA are analyzed using the same framework. See Wade v. Automation Pers. Servs., Inc., 612 F. App'x 291, 300 (6th Cir. 2015) (citing Gee–Thomas v. Cingular Wireless, 324 F. Supp. 2d 875, 881 (M.D. Tenn. 2004)).

---

[13] Defendants also argue that the fifth factor, employer liability, is not met here, arguing that Ramirez was a co-worker, not a supervisor. (ECF No. 48-2 at PageID 569–70.) However, under either scenario, Defendants' prompt actions in addressing Plaintiff's allegations (Ramirez was terminated less than two months after the first incident), tends to show that she could not, as a matter of law, meet the fifth factor either. See EEOC v. AutoZone, Inc., 692 F. App'x 280, 282–83 (6th Cir. 2017) (citing Vance v. Ball State Univ., 133 S. Ct. 2434, 2439–42 (2013)).

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any . . . unlawful employment practice[.]" 42 U.S.C. § 2000e–3(a). A retaliation claim first requires a prima facie showing, including proof that (1) Plaintiff engaged in activity that is protected under Title VII, (2) her employer "knew of her exercise of protected rights," (3) her employer "subsequently took an adverse employment action against her," and (4) "there was a causal connection between her protected activity and the adverse employment action." Mann v. Navicor Grp., LLC, 488 F. App'x 994, 1000 (6th Cir. 2012) (citing Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009)).

To begin, Plaintiff appears to contend that Ramirez retaliated against her for rejecting his conduct toward her,[14] and that Defendants retaliated against her for complaining about Ramirez's inappropriate conduct. (ECF No. 51 at PageID 876–77.) Although it is not clear whether Ramirez was Plaintiff's supervisor (ECF Nos. 48-2 at PageID 576–78), and thus whether his actions could constitute retaliation, because the adverse employment action Plaintiff alleges in connection with Ramirez's actions is not sufficient as a matter of law, the dispute over Ramirez's position is not relevant.

The third element, an "adverse employment action," includes conduct "that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'" and "encompasses more than just actions that affect 'the terms, conditions or status of employment.'" Wyatt v. Nissan N. Am., Inc., 999 F.3d 400, 419 (6th Cir. 2021) (quoting Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 345 (6th Cir. 2008)). For instance, an adverse employment action "can include 'a loss in pay or benefits, a detrimental change in responsibilities, a negative change

---

[14] It is unclear that the rejection of inappropriate conduct constitutes "retaliation."

in the terms and conditions of employment, or some such actual and unfavorable change in job status.'" Mast v. IMCO Recycling of Ohio, Inc., 58 F. App'x 116, 123 (6th Cir. 2003) (quoting Birone v. Indian River School, 145 F.3d 1329 (table), 1998 WL 199791, at *4 (6th Cir. April 15, 1998)). But "[d]e minimus employment actions are not actionable, as the 'change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Id. (quoting White v. Burlington Northern & Santa Fe Ry. Co., 310 F.3d 443, 450 (6th Cir. 2002)).

Defendants argue that they took no adverse employment actions against Plaintiff and, even if they did, Plaintiff's allegations are not tied to her protected activity. (See ECF No. 48-2 at PageID 570.) In response, Plaintiff points to two adverse actions to make out her case— Ramirez's reduction of her hours on July 17 and July 18 and her alleged constructive discharge. (ECF No. 51 at PageID 875–79.) Even assuming Plaintiff's factual contentions related to both are true, neither one is an adverse employment action under the law.

Although a reduction in hours can constitute an adverse employment action, see Norman v. Rolling Hills Hosp., LLC, 820 F. Supp. 2d 814, 824 (M.D. Tenn. 2011), the lost work on July 17[15] and 18 is insufficient. Indeed, the hours lost during those two days did not lead to fundamental changes regarding Plaintiff's hours. Following those two days, she was offered the same or a similar position at multiple other stores, with no difference in hours. (ECF No. 51-1 at 904–05 ¶ 68.) And she offers no legal authority to support her assertion that missing two days of

---

[15] It is unclear whether Ramirez instructing Plaintiff to not come in on July 17 could be considered as retaliation because Plaintiff allegedly told Ramirez the next day that she did not want to be around him. However, even with this conduct, the Court's conclusion does not change.

work is sufficiently material to constitute a tangible employment loss.  (See ECF No. 51 at PageID 872.)  These lost hours, at most, constitute a de minimus employment action.

Plaintiff also contends that she was constructively discharged (see ECF No. 51 at PageID 872–73, 877–78) but, as a matter of law, the proof does not support this contention.  To establish a constructive discharge, a plaintiff must demonstrate that "(1) 'the employer deliberately created intolerable working conditions, as perceived by a reasonable person,' and (2) 'the employer did so with the intention of forcing the employee to quit.'"  Funk v. City of Lansing, 821 F. App'x 574, 580 (6th Cir. 2020) (quoting Laster v. City of Kalamazoo, 746 F.3d 714, 727–28 (6th Cir. 2014)).  "'[B]oth the employer's intent and the employee's objective feelings must be examined.'"  Watson v. City of Cleveland, 202 F. App'x 844, 856 (6th Cir. 2006) (emphasis added) (quoting Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999)).  Thus, the operative question is whether a "reasonable person standing in [an employee's] shoes would have felt compelled to resign."  Logan v. Denny's, Inc., 259 F.3d 558, 567 (6th Cir. 2001).  And an employer's investigation and corrective actions can indicate that the employer did not intend for the employee to leave.  See Burns v. Berry Glob., Inc., No. 21-5359, 2022 WL 351769, at *8 (6th Cir. Feb. 7, 2022).

Plaintiff argues that she was constructively discharged because Defendants did not tell Ramirez to leave her alone, either during Defendants' investigation or after Ramirez's termination, and did not show Plaintiff the recording of the shooting.  (ECF No. 51 at PageID 867–68.)  Moreover, Plaintiff believes that Defendants wanted her to work at unsafe stores. (ECF No. 51-1 at PageID 892–93 ¶ 28.)  She contends that her constructive discharge arose after her protected actions because it tied back to Defendants' response to the shooting and, according to Plaintiff, "Ramirez had shot Plaintiff's car because he was fired based on Plaintiff's sex

harassment and retaliation complaint." (ECF No. 51 at PageID 877.) Defendants argue that Plaintiff cannot demonstrate that her decision to leave and work for a competitor constituted a constructive discharge. (ECF No. 48-2 at PageID 581.) Indeed, examining Defendants' actions as a reasonable person would, there is no proof of a constructive discharge.

To begin, notably, there is no indication that Defendants intended Plaintiff to quit. After the shooting, Defendants told Plaintiff to take as much time as she needed to move, and offered her four different options of stores where she could work as a Commercial Specialist or as another type of manager. (ECF No. 51-1 at PageID 904 ¶ 65, PageID 904–05 ¶ 68.) It was Plaintiff's choice to decide whether she wanted to continue working for Defendants and, if so, where.

When she was making this decision, Ramirez no longer worked for Defendants and thus they were not in a position to tell him to stay away from her.[16] And Defendants' decision to not show her a recording that police showed her does not create an "objectively intolerable" working condition. Even if Plaintiff declined an option offered by Defendants because she perceived a potential connection to Ramirez,[17] the numerous options they did offer contradict any conclusion that Plaintiff was constructively discharged.

Defendants' undisputed actions demonstrate their intent to support her, not to create intolerable working conditions or urge her to quit. Even if Defendants' employees should have taken more concrete steps to keep Ramirez away from Plaintiff, as she alleges, there is no evidence that any failure to do so was intended to make Plaintiff's experience intolerable.

---

[16] Of note, Plaintiff stated that she never saw Ramirez again after July 18. (ECF No. 51-1 at PageID 901 ¶ 53.)

[17] There is no proof that this occurred, but the conclusion is the same, even if it did.

Indeed, there is no proof that Defendants knew where Ramirez was, but failed to tell Plaintiff so that she could tell the police, despite her assertions.  (See ECF No. 54-1 at ¶¶ 63, 67–68.)  Furthermore, even if Ramirez was responsible for shooting Plaintiff's car, he was not working for Defendants when the incident occurred.

Plaintiff contends that there remain genuine issues of material fact as to her constructive discharge, citing Doe v. New Aspen Management LLC, No. 3:20-cv-00125, 2021 U.S. Dist. LEXIS 210367 (M.D. Tenn. Nov. 1, 2021.)  (ECF No. 51 at PageID 877–78.)  In Doe, a case not involving constructive discharge, a property manager was sexually assaulted while on the job, and sued her employer.  2021 U.S. Dist. LEXIS 210367, at *2, 8–11.  The court declined to grant summary judgment, concluding that the employer knew or should have known about the possibility of assault because the property manager worked in a high-crime area, where a resident had reported being sexually assaulted a month before the incident.  Id. at *8–11.  Here, however, there is no evidence that Defendants knew of shootings or other violent crimes at Store 9801 before Plaintiff's car was shot.  Nor is there evidence that any of the other stores where Plaintiff could have worked were in a high-crime area, let alone if Defendants knew their crime statistics.

Because Plaintiff cannot demonstrate that she experienced an adverse employment action, Plaintiff's retaliation claim fails as a matter of law.[18]

## III.    IIED and Outrageous Conduct

Finally, Defendants assert that Plaintiff's IIED and outrageous conduct claim lacks merit. "Under Tennessee law, '[i]ntentional infliction of emotional distress and outrageous conduct are

---

[18] Defendants also assert that they can raise an affirmative defense to bar a retaliation claim.  (See ECF No. 48-2 at PageID 582–83.)  However, because Plaintiff cannot make out a prima facie case of retaliation, the Court does not reach that issue.

different names for the same cause of action' for intentional infliction of emotional distress."

Harrison v. City of Dickson, No. 3:11-CV-01044, 2013 WL 1482950, at *16 (M.D. Tenn. Apr.

11, 2013) (modification in original) (quoting Rogers v. Louisville Land Co., 367 S.W.3d 196,

204–05 (Tenn. 2012)).  According to the Tennessee Supreme Court, the term "outrageous

conduct" is "more accurately and correctly used as referring to an element of intentional

infliction of emotional distress."  Rogers, 367 S.W.3d at 205 (emphasis in original).  Thus,

Plaintiff's "outrageous conduct" claim is addressed as part of her IIED claim.

        "In Tennessee, 'the elements of an intentional infliction of emotional distress claim are

that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not

tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff.'"  Fernald

v. JFE Franchising, Inc., No. 2:22-cv-02761-JTF-cgc, 2023 WL 2938312, at *4 (W.D. Tenn.

Apr. 13, 2023) (quoting Rogers, 367 S.W.3d at 205).  If conduct is "outrageous," then "it 'has

been so outrageous, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community.'"  Id. (quoting Odom v. Claiborne

Cnty., 498 S.W.3d 882, 887 (Tenn. Ct. App. 2016)).  When evaluating an IIED claim, "[t]he

'outrageous conduct requirement is a high standard which has consistently been regarded as a

significant limitation on recovery.'"  Nettles v. Hotel Peabody, G.P., No. 2:09-cv-02776-JPM,

2010 WL 5093362, at *2 (W.D. Tenn. Dec. 8, 2010) (quoting Doe 1 ex rel. Doe 1 v. Roman

Catholic Diocese of Nashville, 154 S.W.3d 22, 39 (Tenn. 2005)).  Even "[s]exual harassment

will only support an outrageous conduct claim when the harassment alleged is especially heinous

compared to other sexual harassment claims."  Cossairt v. Jarrett Builders, Inc., 292 F. Supp. 3d

779, 790 (M.D. Tenn. 2018) (modification in original) (internal citations omitted).

Plaintiff asserts that a jury could find that the "constructive discharge based on a hostile work environment," the shooting the day after Ramirez's discharge, the buttocks pinch, Ramirez's other actions toward her, Defendants' failure to assist her in addressing the threats posed by Ramirez after his termination, and Defendants' disregard of their duties to provide a harassment free work environment all demonstrate outrageous conduct.  (ECF No. 51 at PageID 879–82).  She contends that this outrageous conduct led her to suffer severe emotional distress.  (Id. at PageID 882.)  Defendants argue that Plaintiff cannot meet the elements of her IIED claim.  (ECF No. 48-2 at PageID 584–87.)

To begin, several of Plaintiff's examples of "outrageous conduct" cannot, as a matter of law, be considered here.  As described above, because Plaintiff cannot demonstrate that she experienced a constructive discharge, this cannot be a basis for her recovery on this or any claim.  Second, Plaintiff has produced no evidence that one of Defendants' employees shot her car.  Even if Ramirez was responsible for the shooting, he was terminated the day before it occurred, and Defendants cannot be liable for Ramirez's conduct outside of the scope of his employment.  See Hughes v. Metro. Gov't of Nashville & Davidson Cnty., 340 S.W.3d 352, 363 (Tenn. 2011) (quoting White v. Revco Disc. Drug Ctrs., Inc., 33 S.W.3d 713, 718 (Tenn. 2000)).

Although Plaintiff's remaining examples implicate employees who were at work under Defendants' purview, none of these instances meet the high bar to be considered as "outrageous conduct" for an IIED claim.  The pinch and Ramirez's other actions, and Defendants' attempts to address the situation, do not meet the high bar of being "utterly intolerable in a civilized community" under Tennessee law, particularly given the short time frame during which this all occurred.  Moreover, although Plaintiff alleges that "Defendant[s'] management allowed, ignored[,] and ratified a great deal of Ramirez's conduct" (ECF No. 51 at PageID 880), and that

they treated her improperly after Ramirez's termination, she testified that her beliefs regarding Defendants' protections of Ramirez are based on a "gut feeling" and without factual support (ECF No. 51-2 at PageID 937, 991–92). Her subjective beliefs are insufficient to establish a dispute of material fact.

Plaintiff argues that the cumulative effect of the actions she suffered could be found by a jury to constitute outrageous conduct, relying on several cases where the actions constituting "cumulative effect" occurred over much longer periods of time. (ECF No. 51 at PageID 880–81.) In Pollard v. E.I. DuPont de Nemours Co., 213 F.3d 933, 946–47 (6th Cir. 2000), rev'd sub nom. Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843 (2001), a plaintiff's IIED claim arose from years of mistreatment characterized as a "slow torture." Additionally, Steele v. Superior Home Health Care of Chattanooga, Inc., No. 03A01-9709-CH-00395, 1998 WL 783348, at *11 (Tenn. Ct. App. Nov. 10, 1998), involved an extended period of harassment and a rape, and Levy v. Franks, 159 S.W.3d 66, 84–85 (Tenn. Ct. App. 2004), involved multiple death threats, more severe than the examples Plaintiff cites. Plaintiff's claims relate to her work between June and September 2023, a matter of months rather than years of alleged mistreatment. She fails to demonstrate that she experienced sufficiently outrageous conduct.

Moreover, Plaintiff has not demonstrated that she suffered from a mental injury that could meet the high bar required for an IIED claim. A successful IIED claim can only be in response to a "'mental injury which is so severe that no reasonable [person] would be expected to endure it.'" Geeslin v. Bryant, 453 F. App'x 637, 640 (6th Cir. 2011) (modification in original) (quoting Arnett v. Domino's Pizza I, L.L.C., 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003)). In Gresslin, for instance, a plaintiff's anxiety and sleeplessness were insufficient to survive summary judgment on an IIED claim under Tennessee law. Id. (citing Miller v.

<u>Willbanks</u>, 8 S.W.3d 607, 615 n.4 (Tenn. 1999)).  Although Plaintiff relocated and testified that she feels unsafe, she also testified that she sleeps fine and has neither sought counseling nor medical help.  (<u>See</u> ECF No. 51-2 at PageID 995–96.)  Plaintiff has not demonstrated that she experienced a mental injury severe enough to be beyond the bounds of reasonableness.

Plaintiff's IIED claim fails as a matter of law.

## <u>CONCLUSION</u>

Because no disputes of material fact remain regarding Plaintiff's sexual harassment, retaliation, and IIED claims, and Defendants are entitled to judgment as a matter of law, the Motion for Summary Judgment is **GRANTED**.[19]

**IT IS SO ORDERED,** this 31st day of July, 2025.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

---

[19] With this ruling, Defendants' Motion for Sanctions (ECF No. 38) is **DENIED AS MOOT**.